**In re Jesse CROMER, Debtor.**

**Paul KROHN, Chapter 7 trustee for the estate of Jesse Cromer, Plaintiff,**

**v.**

**Jesse CROMER, Defendant.**

**Bankruptcy No. 189–13264–260.
Adversary No. 190–1140–260.**

United States Bankruptcy Court,
E.D. New York.

Sept. 24, 1997.

Finkel, Goldstein, Berzow & Rosenbloom, L.L.P. by Kevin Nash, New York City, for Plaintiff.

Lance Roger Spodek, P.C., by Lance Roger Spodek, New York City, for Debtor/Defendant.

## Memorandum Opinion

CONRAD B. DUBERSTEIN, Chief Judge.

Debtor, Jesse Cromer, filed a chapter 7 petition in bankruptcy on October 11, 1989. On April 30, 1990, plaintiff, Paul Krohn, acting in his capacity as chapter 7 trustee, filed a complaint objecting to debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), (3) and (5). Debtor filed an answer denying plaintiff's allegations on May 30, 1990. A trial was conducted on October 14, 1994, December 5, 1994 and December 8, 1995. For the reasons stated below, debtor is denied a discharge under 11 U.S.C. § 727(a)(3). Those counts of plaintiff's complaint seeking to deny debtor a discharge under 11 U.S.C. § 727(a)(2) and (5) are denied.

## Facts

During the 1980's and early 1990's, Jesse Cromer ("debtor"), owned and operated various small businesses. Like many businessmen, debtor was often in need of financing to facilitate or to expand his business operations. In one such instance, debtor applied for a loan from Standard Charter Bank in 1987. As part of debtor's application, debtor included a financial statement dated April 21, 1987 prepared by Epstein & Company, debtor's accountant. The statement listed debtor's interest in various property including a gas station and real property located at 3–08 151 st Street, Whitestone, New York ("Whitestone property"), furniture and household effects worth $56,000.00 and jewelry worth $83,500.00.

Debtor's primary business was operating a marina in Flushing, Queens. The marina was owned by World Fair Marina, Inc. ("W.F. Marina"), a wholly owned entity of the debtor. Debtor was both president and chief executive officer of W.F. Marina. In 1983, W.F. Marina was awarded a license by the City of New York to operate a restaurant at the marina. The following year, W.F. Marina entered into a sublicense agreement with Yachthaven Restaurant, Inc. ("Yachthaven"), an entity in which debtor held an interest. Over the next four years, while Yachthaven operated a restaurant at the premises, New York City issued approximately eighteen notices to W.F. Marina concerning violations of the license agreement. These violations ranged from debtor's failure to clear debris from the parking lot, to W.F. Marina's failure to pay the licensing fee and W.F. Marina's failure to provide required financial statements. W.F. Marina's failure to comply with these notices led the New York City Department of Parks to seize the marina in 1988. As a result, debtor was denied access to the premises.[1]

A second entity in which debtor held an interest was Cromco Corporation ("Cromco"). Debtor was the sole shareholder and principal of Cromco. Cromco's principal asset was a factory located at 15–32 127th Street, College Point, New York ("College Point property"). On May 5, 1988, Cromco entered into a contract to sell the College Point property to J.O. Holding Corporation ("J.O."), whose principal, John Orta ("Orta"), was a business associate of debtor. The contract price for the property was $970,000.00. In conjunction with the contract, debtor and Orta drafted what the parties have referred to as the "Side Agreement" which was dated May 9, 1988. Pursuant to the terms of the Side Agreement, Orta was to pay debtor an additional $200,000.00 over and above the purchase price with $50,000.00 to be paid upon the signing of the contract and $50,000.00 to be paid at closing. The remaining $100,000.00 was to be paid in monthly increments of at least $5,000.00 be-

ginning one year after closing at ten percent interest. Though the Side Agreement was not signed by either party, it is clear that as of September 27, 1988, Orta had made payments to debtor pursuant to the terms of the Side Agreement.

Debtor also held an interest in an entity known as Advanced Pollution Control Contracting, Inc. ("APC"). Prior to 1988, debtor owned fifty percent of the stock of APC with John Bergen owning the other fifty percent. On August 5, 1988, debtor borrowed $125,000.00 from APC. In exchange, debtor signed a note payable to APC in the amount of $116,311.00 to be repaid on August 5, 1989. In addition, debtor turned over his stock in APC to APC to be held as collateral. The note provided that in the event of default, APC had the right to sell debtor's shares with the proceeds to be applied to the amount due.

It being apparent that debtor would be unable to repay the amount due under the August 5, 1988 note, debtor entered into an agreement with APC on February 20, 1989, to sell his shares in APC to APC. In consideration for debtor's stock and his promise to resign as an officer and director of APC, APC agreed to forgive debtor's indebtedness to APC under the August 5, 1988 promissory note. Simultaneously, debtor and APC entered into an employment agreement whereby APC would employ debtor as General Construction Manager for a period of two years.

Debtor used $75,000.00 of the $125,000.00 borrowed from APC to pay the law firm of Myerson & Kuhn to file bankruptcy petitions on behalf of debtor and W.F. Marina. Fifty thousand dollars was to be used for the W.F. Marina bankruptcy and $25,000.00 for debtor's case. Myerson & Kuhn filed a chapter 11 petition on behalf of W.F. Marina on October 3, 1988. Before an individual petition was filed for debtor, however, Myerson & Kuhn itself filed a petition in bankruptcy. Myerson & Kuhn never filed a petition for debtor nor did they refund the $25,000.00 to

---

1. For a full discussion of the facts leading up to the seizure of W.F. Marina, see this court's opinion on the chapter 7 trustee's motion to assume and assign the agreement between Yachthaven and W.F. Marina reported as *In re Yachthaven Restaurant, Inc.,* 103 B.R. 68 (Bankr.E.D.N.Y. 1989).

debtor. As a result, debtor became an unsecured creditor for much of the funds it had advanced to Myerson & Kuhn.

Debtor filed a chapter 7 petition in bankruptcy on October 11, 1989. On Schedule B, debtor listed as personal property a debt owed to him by John Orta in the amount of $125,000.00 based on the payments remaining under the Side Agreement. Also on Schedule B, debtor listed a malpractice claim against Myerson & Kuhn based on their failure to file a bankruptcy petition for debtor. In response to question 2(c) on his statement of financial affairs, debtor stated that he sold his 50% ownership in APC to his former co-shareholder. Paul Krohn ("plaintiff"), was assigned as chapter 7 trustee to debtor's case.

On April 30, 1990, plaintiff filed a complaint objecting to debtor's discharge under 11 U.S.C. § 727(a)(2), (3) and (5) based primarily on debtor's involvement with the Side Agreement and the sale of his APC stock. Debtor filed an answer on May 30, 1990. After numerous adjournments, a trial on plaintiff's complaint was held on October 14, 1994, December 5, 1994 and December 8, 1995. A final determination of the issues in this adversary proceeding was held in abeyance pending the submission of parties' post-trial memorandae. The record is now complete, and this opinion constitutes the Court's findings of fact and conclusions of law.

### Discussion

Plaintiff's complaint objects to debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), (3) and (5). For objections to discharge, Federal Rule of Bankruptcy Procedure 4005 places the burden of proof on the objecting party. FED. R. BANKR. P. 4005. The party objecting to the discharge must prove the objection by a preponderance of the evidence. *See Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393–94 (6th Cir.1994); *Minsky v. Silverstein (In re Silverstein)*, 151 B.R. 657, 660 (Bankr.E.D.N.Y.1993).

### A. *11 U.S.C. § 727(a)(2)*

■ In the third claim for relief in his complaint, plaintiff alleges that debtor should be denied a discharge under § 727(a)(2) based upon debtor's participation in the Side Agreement. Pursuant to § 727(a)(2), a debtor is denied a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). Initially, it appears from plaintiff's complaint that plaintiff would have this court deny debtor a discharge under § 727(a)(2) based merely on the fact that debtor entered into the Side Agreement. Plaintiff alleges that debtor entered into the Side Agreement with Orta in order to structure the sale of the College Point property in such a manner as to avoid paying the tax imposed by section 1441 of the New York Tax Law. Section 1441 imposed a tax on the seller on a sale of real property in excess of $1,000,000.00. N.Y. TAX LAW §§ 1441, 1443 (McKinney) (repealed 1996). By including a $200,000.00 payment in the Side Agreement, the parties were able to list the purchase price of the College Point property in the contract for sale as $970,000.00, thus evading the tax imposed under section 1441 even though a purchase price in excess of $1,100,-000.00 was intended.

This ground of plaintiff's complaint fails for several reasons. First, plaintiff has not met his burden of proving that an agreement was actually reached. It is not disputed that neither party signed the Side Agreement, therefore it is questionable at best whether the Side Agreement constitutes a binding agreement. Because this aspect of plaintiff's claim presupposes debtor having entered into a binding agreement, this claim must fail without conclusive evidence that such an agreement was reached. Second, even assuming the Side Agreement was binding on the parties, the only date appearing on the Side Agreement is May 9, 1988. Without evidence to the contrary, the court would

have to find that debtor and Orta entered into the Side Agreement on May 9, 1988, more than one year prior to debtor filing his chapter 7 petition. Thus, debtor's act of entering into the transaction is outside of the period enunciated in § 727(a)(2)(A).[2] Third, it is clear that the College Point property belonged to Cromco and not to the debtor personally. Because § 727(a)(2) concerns only transfers of property belonging to the debtor or to the debtor's estate, it is inapplicable to the transfer of the College Point property from Cromco to J.O.

■ Plaintiff also argues that debtor should be denied a discharge under § 727(a)(2) based on his receipt of funds under the Side Agreement and the subsequent dissipation of those funds. Debtor received at least $59,000.00 under the Side Agreement.[3] It is not clear from plaintiff's complaint or post trial memorandum, however, whether plaintiff is claiming that debtor transferred, removed, destroyed, mutilated, or concealed these funds. Initially it appears that plaintiff is claiming that debtor attempted to conceal his receipt of funds under the Side Agreement based on debtor's failure to include the receipt of the funds as income in his 1988 federal tax return. Debtor filed his 1988 return postpetition on August 3, 1994. The return listed debtor and his wife as having a combined income of $63,658.00 for 1988. Debtor admitted that the $63,658.00 did not include any of the payments he received under the Side Agreement. (Tr. Dec. 8, 1995 at 10–11). On the other hand, debtor did disclose his receipt of funds under the

Side Agreement to his chapter 7 trustee at the first meeting of creditors. (Tr. Oct. 14, 1994 at 41, 59). He also listed in his schedules the debt owed to him from Orta based on the payments remaining under the Side Agreement. Thus, even though debtor's motives can be called into question by his failure to report the Side Agreement payments as income in his 1988 tax return, debtor's other post petition actions have left no doubt that he did receive payments under the Side Agreement. In fact, it is debtor's own revelations which form a substantial basis of plaintiff's claim under § 727(a)(2). Therefore, despite the fact that debtor failed to include the payments as income on his 1988 tax return, the court does not find that debtor concealed his receipt of the $59,000.00 for purposes of § 727(a)(2).

Though not clearly stated, it is more likely that plaintiff's § 727(a)(2) claim is based on debtor's subsequent transfer of the $59,000.00. Unfortunately, plaintiff's only evidence as to what happened to the funds is debtor's testimony that he used the funds to continue making mortgage payments on the College Point property pending the closing on the contract of sale. (Tr. Dec. 5, 1994 at 71–72). Based on this testimony, the court will infer that plaintiff characterizes these payments as transfers for purposes of § 727(a)(2).

■ In order to deny a debtor a discharge under § 727(a)(2), a plaintiff must prove that: (1) a transfer of property has occurred, (2) the property belonged to the debtor, (3) the

---

**2.** The court is fully aware of the doctrine of continuing concealment whereby a debtor can be denied a discharge based on a transfer that took place prior to one year before the filing of the petition if that debtor took steps to conceal, within the one year period before the filing of the petition, a retained interest in the transferred property. *See In re Silverstein,* 151 B.R. at 661. As will be discussed below, there is no evidence that debtor tried, within a year prior to the filing of his petition, to conceal the existence of the agreement or any property he received under that agreement. Thus the doctrine of continuing concealment does not apply to this case.

**3.** In his complaint, plaintiff claims that debtor received $75,000.00 under the Side Agreement. Plaintiff based this figure on debtor's schedule B where debtor claimed that $125,000.00 remained

outstanding under the Side Agreement, implying that Orta had paid debtor $75,000.00 of the total $200,000.00. Notations on the Side Agreement, however, indicate that debtor received only $59,000.00. The Side Agreement contains the handwritten notation "9/27/88, $59,000 PD To Date" accompanied by the handwritten initials "JC." No other evidence concerning what amount debtor may have received was provided. However, debtor did admit to receiving at least $59,000.00 under the agreement during cross examination. (Tr. Dec. 8, 1995 at 7–8). Based on such conflicting evidence, the court will not make a determination as to the exact amount debtor may have received under the Side Agreement. Instead it is sufficient to find merely that debtor was paid at least $59,000.00 under the Side Agreement.

transfer occurred within the period enunciated in § 727(a)(2), and (4) the debtor had the intent to hinder, delay or defraud a creditor when the transfer was made. *See Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir.1989); *County Real Estate Corp. v. Ishahak (In re Ishahak)*, 130 B.R. 16, 18 (Bankr.E.D.N.Y.1991). As for the first element, it is clear that a transfer took place as debtor testified that he used the funds he received to make mortgage payments on the College Point property. Not so clear, however, is whether the funds debtor received under the Side Agreement were paid to him personally (and therefore became debtor's property upon receipt) or were paid to him in a representative capacity of Cromco (and therefore did not become property of the debtor and § 727(a)(2) would not apply). A review of the evidence leads the court to the conclusion that Orta and debtor intended that debtor receive these funds in a personal capacity. Highly indicative of this intent is the Side Agreement, which merely states that Orta was to pay "Jesse Cromer." Nowhere does the Side Agreement suggest that debtor was to receive the funds in his capacity as principal of Cromco. The most telling evidence, however, is debtor's own testimony. At trial, though he admitted that he did little to distinguish between his own finances and those of his corporations, debtor repeatedly acknowledged that the Side Agreement was between himself and Orta personally, that the outstanding payments under the Side Agreement were owed directly to him and that he could "do what he wanted to" with any funds received under the agreement. (Tr. Dec. 5, 1994 at 81–82; Dec. 8, 1995 at 7). In light of this testimony, the court finds that the funds debtor received under the Side Agreement belonged to him personally and therefore constituted property of the debtor for purposes of the second element necessary for a § 727(a)(2) objection.

■ Plaintiff does not provide any evidence of when debtor may have made the mortgage payments in question. The evidence establishes that debtor received at least $59,000.00 under the Side Agreement by September 27, 1988. Obviously any mortgage payments made by debtor using these funds prior to one year of debtor filing his petition (October 11, 1988) are outside the scope of § 727(a)(2)(A). What mortgage payments debtor may have made following October 11, 1988 is not known as plaintiff failed to elicit this information at trial. Accordingly, element three, which requires that the transfer have been made within one year prior to filing, has not been met.

■ In addition, plaintiff has failed to provide any evidence that debtor intended to hinder, delay, or defraud a creditor or an officer of the estate when he used the funds he received under the Side Agreement to make mortgage payments on the College Point property. Because direct evidence of fraudulent intent is rarely available, courts have inferred an intent to hinder, delay or defraud based on the circumstances surrounding the transfer. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir.1983). Factors considered to infer intent (often referred to as the "badges of fraud") include the lack of adequate consideration for the transfer, a family or other close relationship between the transferor and the transferee, retention of control over the transferred property by the transferor, the financial condition of the transferor both before and after the transfer and the relationship of the transfer to a pattern or course of conduct. *Id.* at 1582–83. Unlike classic cases of fraud where an insolvent debtor transfers property for little or no consideration and retains control over the transferred property, see, e.g., *In re Kaiser*, 722 F.2d at 1583 (holding that debtor's purchase of two homes while insolvent and placing title to those homes in wife's name was classic badge of fraud); *EFA Acceptance Corp. v. Cadarette (In re Cadarette)*, 601 F.2d 648, 651–52 (2d Cir.1979) (holding that debtor's transfer of car, boat and trailer to fiancee without consideration three weeks prior to filing bankruptcy was done with fraudulent intent); *In re Silverstein*, 151 B.R. at 662 (holding that debtor's transfer of his one-half interest in marital home to his wife for no consideration was sufficient to deny debtor a discharge under § 727(a)(2)(A)), the only evidence in this case is that debtor used the funds he received under the Side Agreement to continue making payments on an obligation he felt bound

to make. Without further evidence, this court cannot infer that debtor acted with intent to hinder, delay or defraud creditors under the circumstances.

Because plaintiff has not met his burden of proof in regard to the third and fourth elements, the relief requested in plaintiff's complaint is denied to the extent that it asks this court to deny debtor a discharge under § 727(a)(2) based on his participation in the Side Agreement.

■ In the fourth claim for relief in his complaint, plaintiff argues that debtor should be denied a discharge under § 727(a)(2) because he intended to hinder, delay or defraud his creditors when he failed to include in his bankruptcy schedules and statement of financial affairs several assets which appeared on his April 21, 1987 financial statement. In particular, plaintiff refers to debtor's failure to provide an explanation why his interest in the Whitestone property and $83,500.00 worth of jewelry is not listed in his schedules.[4]

According to debtor, the reason he did not list any of this property on his schedules is that he did not hold an interest in any of this property when he filed his bankruptcy petition. Debtor testified that his interest in the Whitestone property consisted of a lease to operate a gas station obtained from the Port Authority of New York and New Jersey. Debtor claimed that he turned over his interest in the lease to George Borg ("Borg"), the manager that he had hired to run the gas station because it was impossible for him to make a profit unless he ran the business himself which he could not do. (Tr. Dec. 5, 1994 at 76). In regard to the jewelry, debtor claimed that he had stored the jewelry in a closet in the office of W.F. Marina and that he has not had access to the safe since the Parks Department seized the premises in 1988. (Tr. Dec. 5, 1994 at 54–60).

The court does not find that plaintiff has established by a preponderance of the evidence that debtor transferred his interest in the Whitestone property with fraudulent intent. Similar to debtor's receipt of funds under the Side Agreement, the only evidence of what happened to debtor's interest in the Whitestone property is debtor's testimony. Plaintiff has not submitted any evidence to rebut debtor's contention that he transferred his interest in the Whitestone property for any other purpose than to rid himself of property which was losing money. None of the badges of fraud have been established. Debtor testified that in exchange for his interest, Borg agreed to take over the remaining loan payments on all of the tow trucks. (Tr. Dec. 5, 1994 at 76). No evidence was introduced to show that this was not valid consideration. Nor did the trustee submit evidence to establish other badges of fraud such as whether Borg had any pre-existing relationship with debtor or whether debtor retained control of the gas station following his transfer of the lease. In addition, plaintiff did not inquire of debtor as to when debtor transferred the lease, thus there is no way for the court to determine if the transfer was made within one year of the debtor's filing of his bankruptcy petition.

■ Though debtor claims he was denied access to the jewelry he had stored at W.F. Marina, he remained obligated to list his interest in this property on his schedules. *See Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr.S.D.N.Y.1994) ("Thus, even worthless assets and unprofitable business transactions must be disclosed."); *In re Gugliada*, 20 B.R. 524, 528 (Bankr.S.D.N.Y.1982) (holding that it was the responsibility of debtor's creditors to determine the value of debtor's interest in dissolved corporation, thus debtor was under an obligation to disclose this interest in his schedules). The court will not decide, however, whether debtor was attempting to conceal this property when he failed to include it in his bankruptcy schedules. At the trial on December 5, 1994, this court directed plaintiff to contact the chapter 7 trustee in the W.F. Marina bank-

---

4. Plaintiff also points out that debtor listed only $990.00 worth of household furnishings on his schedules; considerably less than the $56,000.00 value he had assigned to this property just two and a half years prior. At trial, however, the court made the finding that the April 21, 1987 financial statement was obviously inflated in regard to the furniture. (Tr. Oct. 14, 1994 at 88). Accordingly, this aspect of plaintiff's complaint will not be considered.

ruptcy case to inquire into the whereabouts of the safe. Plaintiff agreed to make such an inquiry. (Tr. Dec. 5, 1994 at 58–60). To date, plaintiff has not informed the court as to what action he has taken in this regard, if any. Without knowing the results of such an inquiry, it is inequitable for this court to make a determination concerning debtor's intent at the time he filed his schedules. Accordingly, plaintiff's objection to debtor receiving a discharge as provided in 11 U.S.C. § 727(a)(2) is overruled.

### B. 11 U.S.C. § 727(a)(5)

Under § 727(a)(5), a debtor must be denied a discharge if the debtor "fail[s] to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Though similar to an action to deny a debtor a discharge for concealment of assets under § 727(a)(2), § 727(a)(5) differs in that there is no required element of intent to hinder, delay, or defraud creditors. *See First Am. Bank v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 33 (Bankr.E.D.N.Y.1994). Once the loss or deficiency of an asset has been established, an action under § 727(a)(5) focuses entirely on the plausibility of the debtor's explanation for the loss or deficiency.

The facts in the case presently before us are typical of those usually found in a § 727(a)(5) objection to discharge proceeding. These cases often involve a discrepancy between a prepetition financial statement of the debtor and the debtor's bankruptcy schedules. *See, e.g., Hawley v. Cement Indus. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995) (plaintiff met his burden by showing vast discrepancy between debtor's prepetition financial statement and Chapter 7 schedules). In this case, debtor's bankruptcy schedules do not include the Whitestone property or the $83,500.00 worth of jewelry, both of which appeared on debtor's April 21, 1987 financial statement. A second scenario common to § 727(a)(5) actions is where a debtor acknowledges having had a prepetition interest in an asset but has failed to list that asset as part of his or her estate. *See,*

*e.g., In re D'Agnese*, 86 F.3d 732 (7th Cir. 1996) (debtor admitted to once owning over $300,000.00 worth of jewelry and Waterford crystal and further admitted that these items were not included as part of her bankruptcy estate). In this case, debtor has admitted to receiving $59,000.00 under the Side Agreement and $125,000.00 from his sale of APC stock to APC. None of these funds, however, are listed in debtor's schedules or statement of financial affairs.

A debtor's explanation for the loss or deficiency of an asset need not be meritorious but must convince the judge that the debtor has not hidden or improperly shielded assets. *See In re Bodenstein*, 168 B.R. at 33; *In re Silverstein*, 151 B.R. at 663. Before exploring whether debtor's explanations convince this court that he has not hidden or shielded assets, the court must first satisfy itself that plaintiff has met his initial burden of establishing a prima facie case that there has been a loss or deficiency of debtor's assets. The nature of § 727(a)(5) necessitates the use of a shifting burden of proof. Initially, it is up to the objecting plaintiff to establish a prima facie case for the loss or deficiency of an asset. Once this prima facie case has been established, it is up to the debtor to provide a plausible explanation for the loss or deficiency of the asset. *See In re Hawley*, 51 F.3d at 249; *Barristers Abstract Corp. v. Caulfield (In re Caulfield)*, 192 B.R. 808, 821 (Bankr.E.D.N.Y.1996).

As previously discussed, debtor's failure to include as an asset of his estate the funds he received under the Side Agreement and his sale of APC stock is typical of that often found in § 727(a)(5) litigation. Unfortunately for plaintiff, however, the fifth count of his complaint (the only count which refers to § 727(a)(5)) does not refer to these transactions. Count 5 of plaintiff's complaint merely states:

29. Plaintiff repeats and realleges each and every allegation contained in paragraph "1" through "5", as though more fully set forth at length herein. (None of which refer to the Side Agreement or debtor's sale of the APC stock).

30. Defendant has failed to satisfactorily explain any loss or deficiency of assets to meet his liabilities.

31. That by reason of the foregoing, and pursuant to Section 727(a)(5) of the Bankruptcy Code, the defendant should be denied a bankruptcy discharge.

(Compl. ¶¶ 29–31). As can be seen from the language used, not only does count 5 not refer to the funds received under the Side Agreement or the sale of APC stock, it does not refer to the loss or deficiency of *any* specific assets of the debtor. To a slight degree, this deficiency was corrected at trial. During the course of the trial, the court found it necessary to review the evidence presented regarding the various counts of plaintiff's complaint. In response to the court's inquiry regarding count 5, attorney for plaintiff stated that it referred to the "financial statement and the jewelry and so forth." (Tr. Oct. 14, 1994 at 84). Plaintiff was apparently satisfied with this description of count 5 as he failed to take advantage of an opportunity to further explain the scope of count 5 in his post trial memorandum. Instead, plaintiff merely set forth the applicable legal standards under § 727(a)(5) without applying the law to the loss or deficiency of any of debtor's assets in particular.[5]

Merely reiterating the language of the statute and setting forth the applicable legal standards falls far short of meeting plaintiff's burden to establish a prima facie case that specific assets belonging to the debtor pre-petition were not included in his estate. *See Riumbau v. Colodner (In re Colodner)*, 147 B.R. 90, 94 (Bankr.S.D.N.Y.1992) (finding complaint insufficient when it failed to set forth specific assets of the debtor that were either lost or diminished). In light of plaintiff's failure to adequately set forth in his complaint which assets of debtor in particular were lost or diminished and the subsequent statements made by his counsel at trial on

October 14, 1994, the court will consider the loss or deficiency of only those assets listed on debtor's April 21, 1987 financial statement but not included in his bankruptcy schedules, i.e., debtor's interest in the Whitestone property and the $83,500.00 worth of jewelry.[6]

As previously mentioned, debtor's explanation for not including the $83,500.00 worth of jewelry which he had listed on his April 21, 1987 financial statement on his bankruptcy schedules is that when debtor filed his petition, he no longer had access to the jewelry due to the seizure of W.F. Marina by the Parks Department. (Tr. Dec. 5, 1994 at 54). Though plaintiff questioned the validity of this explanation, plaintiff did agree to investigate the matter further and to report back to the court. (Tr. Dec. 5, 1994 at 58–60). It is certainly possible that the results of such an investigation would lead this court to reject debtor's explanation as unfounded. Unfortunately, however, the court is without the benefit of knowing the results of plaintiff's investigation. As a result, the only evidence the court has before it concerning the disposition of debtor's jewelry is debtor's explanation. Under the circumstances, the court finds the explanation plausible. Debtor's decision to store the jewelry at the marina may not have been the most prudent under the circumstances, but that is not the issue under § 727(a)(5). The explanation must only satisfactorily account for the disposition of the asset; it does not have to justify that disposition as reasonable. *See In re Caulfield*, 192 B.R. at 822 (citing *In re Bodenstein*, 168 B.R. at 33).

In regard to debtor's interest in the Whitestone property, debtor testified that he transferred his interest in the gas station lease to the manager he had hired to run the station because he was losing money under the lease. (Tr. Dec. 5, 1994 at 76). Though uncorroborated by any documentary evidence, plaintiff failed to challenge debtor's

---

5. The ambiguity of count 5 of plaintiff's complaint is in sharp contrast to counts 1—4. Counts 1–4 clearly set out which transactions are to be examined under each subdivision of § 727(a). (Compl. at ¶¶ 6–28, Post Trial mem. at 21–23).

6. It should be noted that the jewelry which was listed on debtor's April 21, 1987 financial statement is not mentioned at all in plaintiff's complaint. Because the possible loss or diminution of the jewelry was discussed considerably at trial, (Tr. Dec. 5, 1994 at 53–60), the court will overlook this fact and will consider whether debtor should have his discharge denied on this basis.

explanation by cross examining debtor in regard to the transfer or by introducing evidence to rebut debtor's explanation. This is similar to the situation presented in *In re Bodenstein* where a debtor provided an uncorroborated, but otherwise plausible explanation for the prepetition disposition of certain life insurance policies, jewelry, furs and antiques. *In re Bodenstein*, 168 B.R. at 33. In *In re Bodenstein*, Bankruptcy Judge Feller of this district found the debtor's explanation sufficient for purposes of § 727(a)(5), notwithstanding the fact that the debtor did not have documentary support for his claim. This court agrees that as long as the debtor's explanation convinces the judge that the debtor has not hidden or shielded assets, corroborating evidence by way of documentation is not necessary in every instance. *See In re Caulfield*, 192 B.R. at 822 (pointing out that not all courts require a debtor's explanation to be corroborated by documentary proof); *In re Bodenstein*, 168 B.R. at 34 (holding that a mandatory requirement that documentary proof be provided under § 727(a)(5) would strip meaning of § 727(a)(3) which is a separate and distinct basis for denying a debtor a discharge). As in *In re Bodenstein*, plaintiff in this case was given ample opportunity to challenge debtor's explanation concerning his transfer of the Whitestone property. Plaintiff chose not to do so. Because debtor has provided plausible explanations for his disposition of the $83,500.00 worth of jewelry and his interest in the Whitestone property which have not been rebutted, debtor cannot be denied a discharge on this ground.

### C. 11 U.S.C. § 727(a)(3)

In counts 1 and 3 of his complaint and in his post trial memorandum, plaintiff argues that debtor should be denied a discharge under § 727(a)(3) based on debtor's failure to keep and maintain books and records concerning debtor's receipt of funds under the Side Agreement and the sale of APC and debtor's subsequent use of those funds. Under count 2 of the complaint, plaintiff requests this court to deny debtor a discharge under § 727(a)(3) for debtor's failure to maintain books and records for his various corporations. Section 727(a)(3) states that:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

The purpose of § 727(a)(3) is to ensure that a debtor provides his creditors and the bankruptcy court with sufficient information to determine the debtor's true financial condition. *See Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992); *Bay View Laundry, Inc. v. Artura (In re Artura)*, 165 B.R. 12, 15 (Bankr.E.D.N.Y.1994). Section 727(a)(3) also assures that a debtor has complied with the minimum disclosure requirements necessary to obtain a discharge. *See Alten*, 958 F.2d at 1230. In determining when and to what extent a debtor must keep and maintain books and records, bankruptcy courts in this circuit have consistently looked to the standard enunciated by the Second Circuit Court of Appeals in *In re Underhill*, 82 F.2d 258 (2d Cir.1936). In *In re Underhill* the court of appeals stated:

The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books and records, then the absence of such amounts to that failure to which the act applies.

*In re Underhill*, 82 F.2d at 259–60. Because the extent to which a debtor must keep and maintain books and records is dependant on the circumstances surrounding the debtor, objections to discharge under § 727(a)(3) must be considered on a case by case basis. *See Aid Auto Stores, Inc. v. Pimpinella (In*

*re Pimpinella),* 133 B.R. 694, 697–98 (Bankr. E.D.N.Y.1991). Not surprisingly therefore, bankruptcy courts are given wide discretion in this area. *See Krohn v. Frommann (In re Frommann),* 153 B.R. 113, 117 (Bankr. E.D.N.Y.1993); *In re Pimpinella,* 133 B.R. at 698.

 Similar to that under § 727(a)(5), § 727(a)(3) utilizes a shifting burden of proof Initially it is up to the plaintiff to show (1) that the debtor has failed to keep and maintain adequate books and records, and (2) that such failure renders it impossible to discern the debtor's true financial condition and identify material business transactions. *See Lansdowne v. Cox (In re Cox),* 41 F.3d 1294, 1296 (9th Cir.1994) (citing *Alten,* 958 F.2d at 1232). Once the plaintiff has established a prima facie case, it is incumbent on debtor to show that the failure to keep and maintain books and records was justified under the circumstances. *Id.*

 Debtor's testimony in regard to what books and records he kept is confusing at best. Debtor testified that all of his books and records, both corporate and personal, were taken when the Parks Department seized W.F. Marina in 1988. (Tr. Dec. 5, 1994 at 42). Debtor maintained that he kept all of his records in an office at the marina, having separate filing cabinets for corporate and personal records. (Tr. Dec. 5, 1994 at 44–45). Debtor also testified that in the Statement of Financial Affairs filed in the W.F. Marina bankruptcy case, he indicated that certain books and records of W.F. Marina were not available because they were in a car owned by debtor which was stolen. (Tr. Dec. 5, 1994 at 50). Whatever books and records he did have in his possession were turned over to plaintiff, (Tr. Dec. 5, 1994 at 78). Somewhat contradictory to all of this, however, was debtor's testimony during cross examination that he kept no personal records during the period immediately preceding the filing of his bankruptcy petition and that he has only his recollection to rely on concerning the disposition of the funds he received under the Side Agreement and the sale of APC stock. (Tr. Dec. 8, 1995 at 17, 21). The court finds this latter testimony sufficient to establish that debtor did not keep and main-

tain books and records concerning his receipt of funds under the Side Agreement and sale of APC stock and their subsequent disposition.

 Without adequate books and records to reflect debtor's receipt and use of these funds, it is impossible to discern debtor's true financial status. Debtor testified that he used the $59,000.00 that he received under the Side Agreement to continue making mortgage payments on the College Point property pending the closing with J.O. (Tr. Dec. 5, 1994 at 71–72). Debtor also testified that he used $75,000.00 of the $125,000.00 he received from the sale of APC stock for legal expenses. (Tr. Dec. 5, 1994 at 60, Dec. 8, 1995 at 16). An additional $40,000.00 of these funds were used to repay a debt owed to Dr. Owen Giber. (Tr. Dec. 8, 1995 at 24). Debtor had no explanation for what he did with the remaining $10,000.00. (Tr. Dec. 8, 1995 at 16–17). Despite demands on him to do so, debtor did not produce a single record to substantiate any of these payments. Forcing the plaintiff to accept debtor's word for the disposition of such substantial sums is in direct contradiction of the purpose of § 727(a)(3). *See In re Frommann,* 153 B.R. at 116 (holding that the policy underlying § 727(a)(3) is to ensure that creditors and the trustee receive sufficient information to ascertain debtor's financial condition); *see also Schultz v. Shapiro (In re Shapiro),* 59 B.R. 844, 848 (Bankr.E.D.N.Y.1986) ("The trustee and creditors are therefore not required to take the debtor's word as to his financial situation."). Accordingly, the court finds that plaintiff has established a prima facie case that debtor has failed to keep and maintain adequate books and records in regard to the funds he received under the Side Agreement and the sale of APC stock and that such failure has rendered it impossible to discern debtor's true financial condition.

 Before addressing whether debtor's failure to keep and maintain books and records in regard to the funds he received under the Side Agreement and sale of APC stock was justified, the court will first consider count 2 of plaintiff's complaint which asks this court to deny debtor a discharge for his failure to maintain books and records for his

numerous corporate entities. An individual debtor's failure to maintain books and records of a corporation is not in itself sufficient to deny that debtor a discharge under § 727(a)(3) because an objection to discharge must be based on the debtor's failure to produce books and records which depict the individual debtor's finances, not that of his or her corporation. *See Phillips v. Nipper (In re Nipper)*, 186 B.R. 284, 289 (Bankr. M.D.Fla.1995). The corporation must be treated as an entity separate and distinct from the individual debtor. *Id.* Therefore, plaintiff's request in count 2 of his complaint to deny debtor a discharge based on debtor's failure to keep and maintain books and records for his numerous corporations is denied. This is not to say, however, that the books and records of a debtor's corporation are never relevant in ascertaining that individual debtor's financial status. In certain cases, a debtor may substitute the books and records of a corporation for his or her own if they accurately portray that debtor's finances.[7] *See In re Martin*, 554 F.2d 55, 58 (2d Cir. 1977); *cf. Stewart Enters., Inc. v. Horton (In re Horton)*, 621 F.2d 968, 971–72 (9th Cir.1980) (noting that only a few cases have allowed a debtor to substitute corporate records for their own and only in situations where the trier of fact found it appropriate to do so).

Whether a debtor's failure to keep and maintain books and records was justified must be determined in light of all the circumstances of the case. *See Alten*, 958 F.2d at 1231. Normally, a debtor is required to keep and maintain books and records if others in like circumstances would have kept books and records. *See Alten*, 958 F.2d at 1231 (quoting *Milam v. Wilson (In re Wilson)*, 33 B.R. 689, 692 (Bankr.M.D.Ga. 1983)); *In re Frommann*, 153 B.R. at 117 (quoting *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 997 (Bankr.N.D.Ill. 1992)). A debtor's duty to keep and maintain books and records under § 727(a)(3) is directly related to the sophistication of the debtor and the complexity of that debtor's

business. The greater the sophistication and complexity, the more that is required in the way of record keeping. *See In re Cox*, 41 F.3d at 1297 (holding that debtor's intelligence, education and experience are factors for whether debtor was under a duty to keep records); *cf. Alten*, 958 F.2d at 1231 (unsophisticated wage earners dealing primarily in cash not required to keep books and records) (citations omitted). In the instant case the debtor is a sophisticated businessman. Prior to his bankruptcy filing, he operated numerous businesses, often through an ownership interest in a partnership or corporation. (*See* Statement of Financial Affairs at 2c. (debtor listed having had an interest in six different companies in the six years preceding his bankruptcy filing)). His business operations ranged from operating a restaurant at W.F. Marina to running a gas station at LaGuardia Airport. Based upon his involvement in these businesses debtor was well aware of the importance of maintaining accurate books and records, whether business or personal. Thus, based on debtor's business sophistication and his involvement in complex business affairs, the court holds that debtor was under a duty to maintain personal books and records. *See In re Artura*, 165 B.R. at 15–16 (stating that when one engages in a business venture, a failure to maintain business or personal records cannot be condoned or excused).

As previously discussed, debtor relies on the fact that the Parks Department seized all of his books and records at W.F. Marina as justification for his failure to produce personal books and records concerning his receipt and subsequent use of funds under the Side Agreement and sale of APC stock. This argument is misplaced, however, as debtor admitted on cross examination that he did not keep any personal records to substantiate his claim that he used the funds to make mortgage payments, pay legal expenses and repay a loan to Owen Giber. (Tr. Dec. 8, 1995 at 17, 21, 26). Whatever light the records seized by the Parks Department

---

7. At trial, the court allowed debtor to introduce evidence concerning the seizure of the corporate records of W.F. Marina by the Parks Department though it questioned the relevance of such evidence. The evidence was allowed on the condition that debtor show its relation to debtor's own books and records.

may shed on debtor's financial condition, they do not support debtor's contention that he made the above payments. Thus, debtor's lack of access to the seized records does not justify his failure to keep records in regard to his receipt and use of funds under the Side Agreement and sale of APC stock.

■ More directly on point is debtor's claim that he did not keep personal books and records during the period immediately preceding his bankruptcy filing because at this time he "was in such a mess . . . [he] did not keep records." (Tr. Dec. 8, 1995 at 17). A deteriorating financial condition does not alleviate a debtor from his duty under § 727(a)(3) to keep books and records. *See Alten,* 958 F.2d at 1232 (holding that insolvency is not an excuse to avoid obligation to provide records). In fact, it is during this time that the need for accurate books and records may be at its greatest. It is important to note that the transactions in question are not inconsequential cash payments of the type in which records are not ordinarily expected to be kept. These transactions involve payments of nearly $200,000.00. With such large sums involved, its is nearly incomprehensible that debtor did not keep records to verify these payments. Accordingly, because debtor has not justified his failure to keep and maintain books and records in regard to his receipt of funds under the Side Agreement and the sale of APC stock and their subsequent use, debtor must be denied a discharge under § 727(a)(3).

### Conclusions

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the General Order of Reference in this District. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

2. Plaintiff has not proven by a preponderance of the evidence that debtor intended to hinder, delay or defraud creditors by entering into the Side Agreement and using those funds to continue making mortgage payments on the College Point property. Accordingly, the relief requested in count 3 of plaintiff's complaint is denied to the extent that it requests this court to deny debtor a discharge under 11 U.S.C. § 727(a)(2).

3. Plaintiff has not proven by a preponderance of the evidence that debtor intended to hinder, delay or defraud creditors by transferring his interest in the Whitestone property prepetition to George Borg. Nor has plaintiff proven by a preponderance of the evidence that debtor intended to hinder, delay or defraud creditors by not including on his schedules the $83,500.00 worth of jewelry which was listed on his April 21, 1987 financial statement. Accordingly, the relief requested in count 4 of plaintiff's complaint is denied to the extent that it requests this court to deny debtor a discharge under 11 U.S.C. § 727(a)(2).

4. Debtor has provided a satisfactory explanation for the discrepancy between his April 21, 1987 financial statement and his bankruptcy schedules in regard to debtor's interest in the Whitestone property and $83,500.00 worth of jewelry. Therefore, plaintiff has not proven by a preponderance of the evidence that debtor has failed to satisfactorily explain the loss or deficiency of assets under 11 U.S.C. § 727(a)(5). Accordingly, the relief requested in count 5 of plaintiff's complaint is denied.

5. Debtor's alleged failure to keep and maintain books and records for his various corporations is not a valid ground to deny debtor a discharge under 11 U.S.C. § 727(a)(3). Therefore, the relief requested in count 2 of plaintiff's complaint is denied.

6. Plaintiff has proven by a preponderance of the evidence that debtor failed to keep and maintain books and records in regard to his receipt of funds under the Side Agreement and sale of APC stock and the subsequent use of those funds. Debtor has failed to prove by a preponderance of the evidence that his failure to keep books and records in regard to his receipt and use of funds was justified. Accordingly, the relief requested in count 1 is granted and the relief requested in count 3 is granted to the extent count 3 asks this court to deny debtor a discharge under 11 U.S.C. § 727(a)(3). Therefore, debtor is denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

Counsel to plaintiff is directed to submit an order in accordance with this opinion.