### In re PLANTATION REALTY TRUST, Debtor.

### Bankruptcy No. 94–44050–HJB.

United States Bankruptcy Court, D. Massachusetts.

March 30, 1999.

**280**

Christopher D. Metzger, Alexandrov, Metzger & Kalmansson, Worcester, MA, for Bruce Marshall.

Steven A. Kressler, Kressler & Kressler, P.C., Worcester, MA, for Plantation Realty Trust, Edward Paquette and Barbara Boucher.

David M. Nickless, Nickless & Phillips, Fitchburg, MA, Chapter 7 Trustee.

## *MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is an "Objection to Proof of Claim" (the "Objec-

tion") filed by debtor Plantation Realty Trust (the "Debtor")[1]. The Objection contends that the claim filed by Bruce Marshall ("Marshall") in the amount of $3,640.00 should be disallowed on the grounds that the claim runs against Sutton Hills Golf Club, Inc. ("Sutton Hills"), and not against the Debtor. In response, Marshall requests that this Court pierce the corporate veil of Sutton Hills and hold the Debtor accountable as Sutton Hills' alter ego. After evidentiary hearing on the Objection, the Court took the matter under advisement.

### I. *Facts*

Based on the evidence taken at foregoing hearing and the undisputed representations of counsel for the Debtor, the Court makes the following findings of fact, pursuant to Bankruptcy Rule 7052, as made applicable to this contested matter pursuant to Bankruptcy Rule 9014.

The Debtor's business enterprise originated as a partnership among four parties. Forming the Debtor as a nominee trust, they caused the Debtor to purchase a parcel of land in Sutton, Massachusetts, intending to build a housing development. Subsequently, two of the partners/trustees withdrew and conveyed their interests to those remaining—Paquette and Barbara Boucher. Paquette and Boucher ultimately abandoned the plan to develop housing on the parcel when the real estate market continued to decline in the late 1980's and early 1990's. However, they did cause the Debtor to purchase contiguous parcels of land, employing opportunities presented by the depressed real estate prices, and amassed approximately 350 acres in Sutton (the "Sutton Parcel").

In 1990, Paquette and Boucher, on advice of counsel, formed Sutton Hills to

1. By Judgment, dated May 22, 1998, in an adversary proceeding brought against Edward Paquette ("Paquette") and Barbara Boucher ("Boucher") (Adv.Proc. No. 97–4008), this Court determined that the defen- dants were jointly and severally liable to the trustee on account of all claims filed against the estate in this case. Consequently, the driving force behind the Objection is Paquette.

develop and operate a golf course and club on the Sutton Parcel. Paquette and Boucher were further advised by counsel to maintain separately the Debtor's ownership of the Sutton Parcel from the operations of Sutton Hills, with Sutton Hills to lease the Sutton Parcel from the Debtor. The Debtor's attorneys also drafted lifetime membership contracts and pre-construction agreements for members to sign upon their joining as members of the Sutton Hills club.

Marshall learned about the golf course development project through an newspaper advertisement, soliciting members. He visited the site and signed several documents to join Sutton Hills club membership, including a "Lifetime Member Contract" (the "Contract") and a "Lifetime Member Pre-construction Agreement" (the "Agreement"). Both documents referred to Sutton Hills and not to the Debtor, and were executed by a Mark R. Farley for Sutton Hills. Membership initiation fees for Marshall totaled $7,500. He paid $1,000.00 at signing and agreed to pay the monthly amount of $165.00 for forty-eight months to cover the remainder. By the terms of the Agreement, the initiation fees were paid to Sutton Hills and were to be held in a segregated escrow account by an independent escrow agent (the "Escrow Account"). The Agreement contained provisions which allowed Sutton Hills to requisition amounts from the Escrow Account for expenses incurred in connection with developing the golf course, but subject to a cap so that repayment of the membership initiation fees, secured by a second mortgage granted to "an independent qualified escrow agent designated by" Sutton Hills was presumably assured.[2] The not so "independent" agent was Paquette. A five acre parcel was set aside from the main parcel making up the golf course to secure the said second mortgage, but it is unclear from the record whether title to the parcel was ever transferred to Sutton Hills by the Debtor.[3]

The club had been scheduled to open in 1992. However, construction stalled, and in 1992 Paquette informed Marshall that construction would not recommence until further financing had been obtained. Paquette also indicated that no further bills for initiation fee installments, beyond the August 1992 payment, would be sent until the project was back on track. Marshall requested a refund of his initiation fees in September of 1992, and again periodically over the next year. No refund was ever provided.

The Debtor filed a petition in this Court under Chapter 11 of the Bankruptcy Code on September 13, 1994. The case was converted to Chapter 7 on February 10, 1995. Marshall timely filed a general, unsecured proof of claim in the amount of $3,640.00 on October 11, 1994.

## II. *Discussion*

The Debtor argues that Marshall has no claim against the Debtor because his contract was with Sutton Hills, and not with the Debtor. Marshall contends that

2. The Agreement Provided in pertinent part: Sutton Hills may from time to time requisition amounts to be released from the Escrow Fund to pay for or reimburse expenses incurred in connection with the development and construction of the golf course; provided that no money will be released from the Escrow Fund except to the extent that the sum of (a) the balance of the Escrow Fund after giving effect to the requisition, plus (b) the fair market value of the golf course land and all improvements on the land, exceeds one hundred fifty percent of the sum of (i) the total amount of initiation fees originally deposited in the Escrow Fund, plus (ii) the unpaid principal balance and interest due on any first mortgage on the golf course land, the proceeds of which are being used to finance the construction of the golf course.

3. However, Paquette testified that the five acres had been sold with the rest of the Debtor's real property by the Chapter 7 Trustee, raising the inference that title had been retained by the Debtor, since the Trustee would otherwise have been powerless to sell that portion of the land.

Sutton Hills was operating as the alter ego of the Debtor, arguing that the corporate veil of Sutton Hills should be pierced. Alternatively, he maintains that Sutton Hills was merely the agent for the Debtor, thus making the Debtor liable as principal for the actions and representations of its agent, Sutton Hills.

■ The existence and legal characteristics of a corporation are matters governed by state law. In Massachusetts, corporations and their shareholders, or different corporations with common shareholders, are generally deemed distinct legal entities. *See Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657, 624 N.E.2d 947 (1993). Without cause, a court cannot look beyond the corporation's legal structure and property to satisfy a judgment or to find legal accountability in others for actions taken in the corporate name. *See id.* However, under unusual circumstances, a court may disregard the corporate form, particularly to defeat fraud or remedy an injury. *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618, 233 N.E.2d 748 (1968) (hereinafter, *"My Bread"*). The incidents of common ownership and management, standing alone, are not enough to pierce the corporate veil. In *My Bread*, the Supreme Judicial Court described two bases from which to establish the existence of a relationship, justifying the imputation of liability among differing corporate entities:

(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and

their respective representatives are acting.

*My Bread*, 353 Mass. at 618–619, 233 N.E.2d 748 (citing cases).

In order to evaluate the propriety of such imputation, courts have also considered several factors, including whether a corporation failed to enjoy sufficient capitalization to support the corporate undertaking, failed to observe corporate formalities, failed to pay dividends, was insolvent at the time of a relevant transaction, diverted corporate funds to the dominant shareholders, had nonfunctioning corporate directors and officers (other than the shareholders), failed to maintain corporate records, or was used for the transactions of the dominant shareholders and/or for a fraudulent scheme. *See Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 16 (1985) (hereinafter, *"Pepsi–Cola"*) (also citing *My Bread* with approval). Courts have used similar theories to reach across boundaries separating different legal entities. *See WJM, Inc. v. Commonwealth of Massachusetts (In re WJM, Inc.)*, 84 B.R. 268, 273 (D.Mass. 1986) (applying *My Bread* standards in determining whether to include trust assets in the bankruptcy estate of a corporate debtor).

Application of the various *Pepsi–Cola* factors to the facts presented here reveals substantial gaps in the record. For example, in the instant case, there was no testimony regarding the capitalization of Sutton Hills; or with respect to financial transactions between the Debtor, Sutton Hills, and Paquette; or respecting the existence or absence of separate records. No evidence was submitted regarding the role played in either organization by officers, directors or trustees other than Paquette. Further, no evidence was submitted regarding the corporate formalities— shareholder meetings, directors' meetings, voting, corporate record keeping, and so on.

On the other hand, Marshall successfully demonstrated that Paquette actively and

directly participated in the affairs of both entities, "exercising some form of pervasive control" over each. All testimony regarding enterprise activities referred to Paquette as the main actor. More importantly, the Debtor and Sutton Hills were both operated by Paquette with insufficient regard for their separate status.[4] The Debtor and Sutton Hills both used Paquette's residence as a mailing address for billing and correspondence and Paquette made representations which justifiably caused confusion regarding how title to the golf course land was held. Marshall testified that Paquette said that Sutton Hills owned the land, even though record title was actually held by the Debtor. Paquette never refuted this testimony. Further, while the Agreement signed by Marshall included a provision for a mortgage to secure repayment of the escrowed initiation fees, record title to the parcel as a whole was held by the Debtor, not Sutton Hills. Paquette testified that he intended to parse out a small portion of the real estate for the purposes of the second mortgage. Apparently, he did not follow through. However, even if he had, the action would have been irrelevant. The Agreement did not specify that the parcel which would secure the fees was a small fraction of the whole property. The implication was clearly to the contrary.[5] In addition, the Agreement called for an independent escrow agent to hold the initiation fees. Paquette testified that he was the 'independent' agent holding the escrow funds, further entangling the relationship between the Debtor, Sutton Hills and himself. And finally, the Debtor's schedules, signed by Paquette, under the pains and penalties of perjury, listed Marshall as its creditor, without indication of any dispute or reservation.[6]

In *My Bread,* the Supreme Judicial Court upheld the Massachusetts Superior Court's determination to disregard the corporate form where several retail distributors were operated out of the same headquarters as their dairy supplier, Cumberland Farms, Inc. *My Bread,* 233 N.E.2d at 752. The sales manager for the supplier gave direct operational orders to the individual retail store managers, apparently was a dominant figure in the closely coordinated enterprise made up of the several retail corporations and the supplier, and dealt ambiguously with the plaintiff regarding the source of his authority—the supplier or the retailers. There, as here, no evidence was produced regarding the commingling of corporate finances or undercapitalization. There, as here, the agent made representations to a third party which were confusing, and perhaps misleading, regarding the source of his authority. And there, as here, the agent failed to clearly indicate in which capacity he was acting. The similarities between the actions of Paquette and those of the sales manager in *My Bread* are sufficient to hold the Debtor liable for the claim of Marshall. Here, as there, piercing of the corporate veil is appropriate

4. Paquette would place the blame for what follows on the Debtor's former counsel. Even were this Court to buy that unsupported argument, it would be no defense to liability for the harm visited upon Marshall.

5. The Agreement was silent on what property was subject to the mortgage. However, the Agreement made reference to the fair market value of the golf course land in calculating the formula limiting the requisition amounts from the Escrow Account. Also, the Agreement indicated that the second mortgage would only be subject to the first mortgage securing financing of the construction of the golf course. Counsel for the Debtor suggested

that Marshall should have inquired as to what property was mortgaged under security provision, perhaps even gone to the Registry of Deeds to run down title to the parcels himself. Such a requirement would go beyond what is reasonably expected of a non-lawyer who was merely trying to join a golf club. Read as a whole, it is reasonable to assume that the mortgage referred to in the Agreement as securing the fees would be a mortgage against the entire golf course property.

6. Even in the absence of an alter-ego finding, this representation is clearly an admission of liability.

where an individual with pervasive control of multiple entities creates an atmosphere of confusion relative to the assets and activity of each, to the detriment of a third party dealing with what appears to be a single enterprise.

## III. *Conclusion*

For the foregoing reasons, the Court overrules the Objection of the Debtor to the proof of claim of Bruce Marshall. Mr. Marshall's claim is allowed as a general, unsecured claim in the sum of $3,640.00.