Henry AOKI and Kay Aoki, Debtors.

Henry Aoki and Kay Aoki, Appellants,

v.

Atto Corporation, Appellee.

BAP No. MW 04–029.
Bankruptcy No. 03–41386–JBR.
Adversary No. 03–4164.

United States Bankruptcy Appellate Panel
for the First Circuit.

April 4, 2005.

804

Brian J. McAuliffe, Hampstead & Associates, L.C., on brief for Appellants.

Sabin Willett, Aaron M. Wais, Bingham McCutchen LLP, Boston, MA, on brief for Appellee.

Before VOTOLATO, DEASY and KORNREICH, United States Bankruptcy Appellate Panel Judges.

KORNREICH, U.S. Bankruptcy Appellate Panel Judge.

This matter is on appeal from an order of the bankruptcy court (1) denying a discharge to the debtors pursuant to 11 U.S.C. § 727(a)(5), and (2) finding the debt owed to Atto Corporation to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). On appeal, the debtors challenge: (1) the bankruptcy court's decision to pierce the corporate veil of Byroma Engineering, Inc., to hold the debtors personally liable for the corporation's debts; (2) the bankruptcy court's determination that the debt owed to Atto Corporation was nondischargeable in the individual debtors' bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A); and (3) the bankruptcy court's denial of discharge to the individual debtors pursuant to 11 U.S.C. § 727(a)(5). For the reasons stated below, we AFFIRM the decisions of the bankruptcy court.

## BACKGROUND

### The Parties

The appellants, Henry and Kay Aoki (collectively, the "Aokis"), are Chapter 7 debtors and residents of Massachusetts. Mr. Aoki has two daughters, Kazuko Kuboyama and Noriko Takayama, who live in Japan. Mr. Aoki has invented a technology used to extract into liquid form the "aroma essence" of organic materials ("Extract"). This process is known as the "Byroma Extraction Device."[1] The Aokis claim that the Extract has beneficial medicinal effects.

The appellee, Atto Corporation, is a Japanese corporation headquartered in Tokyo, Japan, which manufactures and markets bio-technologies in Japan. Mr. Shigemitsu Yamada is the founder and president of Atto Corporation.

---

**1.** It is also referred to as the "Extraction Apparatus and Method" or the "Byroma Device."

### The Aokis' Companies

Over the years, the Aokis have incorporated seven different corporations in Massachusetts, including Byroma Engineering, Inc. ("Byroma"). The Aokis are the sole shareholders, officers and directors of each corporation, with the exception of Byroma Soft, Ltd., the shares of which are entirely owned by Mr. Aoki's daughter, Kazuko Kuboyama. Atto Corporation claims that the Aokis used these corporate vehicles to carry out a common fraudulent scheme as follows: (1) the Aokis made claims to Japanese investors as to the medicinal value and popularity of the Extract and the readiness of the Extraction Device for marketing and sale; (2) investments were then made in reliance upon the Aokis' representations; and (3) the Aokis then quickly moved the invested money to personal and family accounts. Thereafter, when the victim of the fraud developed concerns and litigation ensued, the Aokis used a new corporation to target their next victim.

Atto Corporation identifies two other Japanese companies who were allegedly victims of the Aokis' fraudulent scheme. First, in 1997, the Aokis, through Big Beans, Inc., entered into an agreement with a Japanese corporation, Koujikan, whereby Koujikan agreed to pay approximately 30 million yen (approximately $271,000) for a license to sell the Extract in Japan. Shortly thereafter, a contract dispute ensued and Koujikan sued Big Beans, Inc. in Japan and was awarded a default judgment. After the Koujikan litigation began, the Aokis ceased conducting business through Big Beans, Inc. and incorporated Bio Aroma Corporation.

Next, in 1998, the Aokis, through Bio Aroma Corporation, entered into another licensing agreement for the Extract with another Japanese company, Nihon Kensui, pursuant to which Nihon Kensui paid a deposit of 120–140 million yen for the license and bottles of Extract. Nihon Kensui subsequently initiated a lawsuit against Bio Aroma Corporation and the Aokis in the United States District Court for the District of Massachusetts alleging fraud, and a default judgment was entered against Bio Aroma Corporation and the Aokis. After the Nihon Kensui litigation began, the Aokis ceased conducting business through Bio Aroma Corporation and incorporated Byroma Engineering, Inc. ("Byroma") on August 17, 1999.[2]

### Atto Corporation

On April 28, 2000, the Aokis, on behalf of Byroma, entered into a Non–Exclusive Agency Agreement with Wada Invention Information Center, Inc. of Japan for the solicitation and negotiation of contracts with potential licensees for the manufacture and sale of the Byroma Extraction System. Mr. Teruo Wada, a Japanese citizen residing in Tokyo, was the president of Wada Invention Information Center, Inc. of Japan.

In or about February 2000, Mr. Wada met with Mr. Yamada, founder and president of Atto Corporation, about the Extraction Device and Extract. Thereafter, Mr. Yamada traveled with Mr. Wada to meet with the Aokis in Massachusetts. Between April 27, 2000 and May 1, 2000, Mr. Yamada met with the Aokis and Mr. Wada at Byroma's offices and the Aokis' home in Acton, Massachusetts to discuss a possible licensing venture for the Extraction Device.

---

2. The Aokis are the sole shareholders, officers and directors of Byroma. Mrs. Aoki is the clerk and treasurer of Byroma, and owns a percentage of the shares of the company. Mr. Aoki is the president of Byroma, a director and owns a percentage of the shares of the company.

During negotiations, Mr. Aoki represented that the Extraction Device was a fully functioning product with a ready market, and Byroma could and would deliver functioning Extraction Devices and blueprints for building more Extraction Devices so that Atto Corporation could manufacture and sell the Extraction Device in Japan.[3] Mr. Yamada testified that although he had some concerns about the venture, "Mr. Aoki demonstrated the wonderful personality of the traditional Japanese spirituality . . . it's a Samurai spirit." Impressed by Mr. Aoki's "value of Samurai spirit," the main characteristic of which is "to keep one's promise," Mr. Yamada agreed to enter a licensing venture with Byroma.

On April 29, 2000, Byroma and Atto Corporation entered into a Licensing Agreement granting Atto Corporation the non-exclusive right to manufacture and sell medium-sized Byroma Extraction Devices in Japan.[4] Pursuant to the Licensing Agreement, Atto Corporation was to begin business in Japan by initially importing four Extraction Devices to be built and delivered by Byroma. Mr. Aoki represented to Mr. Yamada that the first two units would be completed by the end of August 2000. In the interim, the Licensing Agreement required Byroma to complete the blueprints and design detail for the "Japanese models." Mr. Yamada claims that Mr. Aoki also told him that he would supply 3,000 marketing brochures for marketing of the Extraction Device in

Japan, and that he would send an engineer to Japan to teach Atto Corporation how to build the Extraction Devices.

Pursuant to the Licensing Agreement, Atto Corporation made three payments totaling approximately $1,294,000 (100 million yen) to Byroma in May 2000. Atto Corporation claims that these funds were immediately diverted to the Aokis' other companies, for their personal use and to Mr. Aoki's daughters. The Aokis claim that Atto Corporation's payment to Byroma was a non-refundable deposit under the terms of the Licensing Agreement, and that Byroma was entitled to use the funds in any manner it saw fit. Moreover, the Aokis claim that the monies were used for legitimate purposes, including payment of Byroma's expenses, professional fees, intercorporate loans and pursuit of other business ventures. By the end of June 2000, more than $800,000 of these funds had been transferred out of Byroma's accounts.

The parties disagree as to what happened next. Atto Corporation claims that Byroma breached the Licensing Agreement first, by failing to perform its obligations under the Licensing Agreement. According to Atto Corporation, despite Atto's $1.2 million investment, Byroma did not commence construction of any of the Extraction Devices, nor did it place any orders with its subcontractor, Product Insight, for the construction of any Extrac-

---

**3.** During meetings with Mr. Yamada, Mr. Aoki made various representations about the medicinal benefits of the Extract and the popularity of the Extract in the United States. At Byroma's offices, Mr. Aoki showed Mr. Yamada a sample of the Extract, and took him on a tour of the facility, showing him prototypes of the Extraction Device. He provided Mr. Aoki with a marketing brochure for the Extraction Device, stated that clinical studies on the human body were being conducted and that

reports would soon be available, and that this would be highly profitable business.

**4.** On May 1, 2000, the Licensing Agreement was amended to, among other things, outline the terms of Atto's purchase of the four Extraction Devices. The agreement was amended again on June 5, 2000, granting Atto the non-exclusive right to manufacture and sell large and small-sized Byroma Extraction Devices.

tion Devices. Moreover, Byroma did not create any blueprints for the Japanese model of the Extraction Device, did not send Atto Corporation any brochures for marketing the Extraction Device in Japan, or send studies regarding the alleged human trials of the Extract's efficiency, as required under the Licensing Agreement. Mr. Yamada testified that he contacted Mr. Aoki numerous times to inquire about the status of the Extraction Devices, but the Aokis became "unreachable."

The Aokis claim, however, that they did place orders with Product Insight for the construction of the four Extraction Devices purchased by Atto Corporation,[5] and that by August 2000, two units were completed and ready for shipment to Japan. However, around that time, they discovered that Atto Corporation was attempting to disassemble and reverse engineer the Extraction Device in direct violation of Byroma's patent rights and, therefore, they refused to ship any units to Japan. The Aokis claim that Atto Corporation's actions constituted a breach of the Licensing Agreement.

By letter dated September 12, 2000, the Aokis' attorney, Michael Katin, advised Atto Corporation that Byroma was invoking its right to terminate the May 9, 2000 order for Extraction Devices due to Atto's alleged violation of Byroma's copyright. The letter also asserted that the Aokis were unwilling to provide Atto Corporation with the Extraction Device because they were afraid Atto Corporation would "reverse engineer it." Thereafter, Atto Corporation and Attorney Katin engaged in a flurry of correspondence. Unable to resolve the matter, Atto Corporation refused

to pay the first installment of the remaining contract fees due on September 29, 2000, and Byroma promptly terminated all remaining agreements with Atto Corporation.

On April 12, 2001, Atto Corporation filed suit against the Aokis and Byroma asserting, among other things, fraud. The state court awarded a default judgment in favor of Atto. However, before the state court could assess damages, the Aokis filed Chapter 7 petitions on behalf of themselves and their corporations on March 14, 2003, and the state court action was stayed. Thereafter, Atto Corporation filed an adversary complaint seeking the denial of the Aokis' discharge pursuant to § 727(a)(5) and/or nondischargeability of the debt owed to Atto Corporation pursuant to § 523(a)(2)(A). The bankruptcy court held a two-day bench trial, during which it heard testimony from Mr. Yamada, Mr. Aoki, Mrs. Aoki and the Aokis' accountant. The bankruptcy court also accepted over 100 exhibits into evidence. On June 9, 2004, the bankruptcy court entered judgment in favor of Atto Corporation on both counts and contemporaneously issued its Findings of Fact and Conclusions of Law. The Aokis appealed.

## JURISDICTION

A bankruptcy appellate panel may hear appeals from "final judgments, orders and decrees [pursuant to 28 U.S.C. § 158(a)(1)] or with leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3)]." *Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends

---

5. Mr. Aoki testified that he contacted Product Insight to begin building the Extraction Devices purchased by Atto Corporation, but that building did not immediately commence due to engineering/design changes which needed to be made to the U.S. model to make it ready for use in Japan. However, several units were ready for shipment by August 2000. The Aokis produced no evidence to support this claim.

the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* at 646 (citations omitted). An interlocutory order " 'only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.' " *Id.* (quoting *In re American Colonial Broad. Corp.,* 758 F.2d 794, 801 (1st Cir.1985)).

 Generally, a bankruptcy court's judgment regarding the nondischargeability of a debtor's obligations under § 523(a)(2) is a final appealable order. *See Werthen v. Werthen (In re Werthen),* 282 B.R. 553, 555–56 (1st Cir. BAP 2002), *aff'd,* 329 F.3d 269 (1st Cir.2003). In addition, a bankruptcy court's order denying a debtor's discharge under § 727(a)(5) is a final order. *See generally In re D'Agnese,* 86 F.3d 732 (7th Cir.1996).

### STANDARD OF REVIEW

Appellate courts reviewing an appeal from the bankruptcy court generally apply the "clearly erroneous" standard to findings of fact and *de novo* review to conclusions of law. *See TI Fed. Credit Union v. DelBonis,* 72 F.3d 921, 928 (1st Cir.1995); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 719 n. 8 (1st Cir.1994). We review each of the bankruptcy court's determinations at issue in this appeal for clear error. *See Crane v. Green & Freedman Baking Co.,* 134 F.3d 17, 22 (1st Cir.1998) (a court's decision to pierce the corporate veil is a factual issue based on an examination of the totality of the circumstances and will not be overturned unless it is clearly erroneous); *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997) (in the context of dischargeability disputes under § 523(a)(2)(A), questions of fraudulent intent are questions of fact that should not be overturned unless clearly erroneous);

*D'Agnese,* 86 F.3d at 734 (appellate courts will not overturn a bankruptcy court's decision to deny discharge pursuant to § 727(a)(5) unless it is clearly erroneous).

### DISCUSSION

### I. Piercing the Corporate Veil

#### A. Applicable law

 The existence and legal characteristics of a corporation are governed by state law. *See Pension Ben. Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir.1983); *see also In re MacDonald,* 114 B.R. 326, 332 (D.Mass.1990). In Massachusetts, corporations and their shareholders are generally deemed to be distinct legal entities. *See Berger v. H.P. Hood, Inc.,* 416 Mass. 652, 624 N.E.2d 947, 950 (1993). However, under unusual circumstances, a court may disregard the corporate form, particularly to defeat fraud or remedy an injury. *See id.; see also In re Plantation Realty Trust,* 232 B.R. 279, 282 (Bankr.D.Mass.1999). "The incidents of common ownership and management, standing alone, are not enough to pierce the corporate veil." *Plantation Realty,* 232 B.R. at 282. However, "shareholders may be held liable where they control the operation of the corporation and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored." *Pepsi–Cola Metro. Bottling Co., Inc. v. Checkers, Inc.,* 754 F.2d 10, 15 (1st Cir.1985) ("*Pepsi–Cola*").

The Massachusetts Supreme Judicial Court has described two situations when piercing the corporate veil is appropriate: "(1) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (2) when there is a

confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748, 752 (1968) (*"My Bread"*).

Adopting the *My Bread* standard, the Court of Appeals for the First Circuit set forth twelve factors to consider when deciding whether to pierce the corporate veil:

(1) common ownership;

(2) pervasive control;

(3) confused intermingling of business activity, assets, or management;

(4) thin capitalization;

(5) nonobservance of corporate formalities;

(6) absence of corporate records;

(7) no payment of dividends;

(8) insolvency at the time of the litigated transaction;

(9) siphoning away of corporate assets by the dominant shareholders;

(10) nonfunctioning of officers and directors;

(11) use of the corporation for transactions of the dominant shareholders; and

(12) use of the corporation in promoting fraud.

*Pepsi–Cola,* 754 F.2d at 16; *see also Evans v. Multicon Constr. Corp.,* 30 Mass. App.Ct. 728, 574 N.E.2d 395, 398 (1991) (applying the *Pepsi–Cola* factors); *The George Hyman Constr. Co. v. Gateman,* 16 F.Supp.2d 129, 151 (D.Mass.1998) (same). Generally, in Massachusetts, *My Bread* sets the standard for deciding when to pierce the corporate veil, and *Pepsi–Cola* identifies a non-exclusive list of factors to be considered when engaging in a *My Bread* analysis. *See, e.g., Birbara v. Locke,* 99 F.3d 1233, 1238 (1st Cir.1996). This analysis is also applicable in the bankruptcy context. *See MacDonald,* 114 B.R. at 331 (the equitable powers of the bankruptcy court enable them to apply the *My Bread* and *Pepsi–Cola* analysis to pierce the corporate veil in order to attribute a non-debtor corporation's assets or liabilities to the shareholders of the corporation) (citation omitted).

**B. Bankruptcy Court's Findings**

■■■ The bankruptcy court weighed the *Pepsi–Cola* factors and concluded that piercing the corporate veil was appropriate, finding as follows:

> After weighing [the *Pepsi–Cola*] factors, the Court finds that it is appropriate to pierce the corporate veil. The Aokis exercised pervasive control over Byroma and were the sole shareholders, officers and directors. While the Aokis did maintain some financial records, these records were permeated with a confused intermingling of corporate funds, undocumented loans between corporations, unexplained and undocumented cash withdrawals from each of the corporations for the Aokis' personal use, use of corporate funds for the Aokis' personal expenses, and unexplained payments to Mr. Aoki's daughters.... [T]he Aokis siphoned money from Byroma, and used Byroma and their other corporations to perpetrate frauds.

■■■ Pursuant to Fed. R. Bankr.P. 8013, "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Under this standard, we must affirm the bankruptcy court's findings of fact, unless our review of the entire evidence leaves us with "the

definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the interpretation assigned by the fact-finder must be adopted. *Id.* at 574, 105 S.Ct. 1504. Additionally, when factual findings are based on determinations regarding the credibility of witnesses, we must accord even greater deference to the trial court's findings. *See Rodriguez–Morales v. The Veterans Admin.,* 931 F.2d 980, 982 (1st Cir.1991) (citing *Anderson,* 470 U.S. at 574, 105 S.Ct. 1504); *see also In re Tully,* 818 F.2d 106, 108–109 (1st Cir.1987) (applying *Anderson* in bankruptcy context). Particular deference is also due to the trial court's findings that depend on the credibility of other witnesses and on the weight to be accorded to such testimony. *See Keller v. United States,* 38 F.3d 16, 25 (1st Cir.1994).

> Questions of credibility are solely for the trier of fact ... who has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.

*D'Agnese,* 86 F.3d at 734.

On appeal, the Aokis expend a considerable amount of time and energy offering explanations for their conduct throughout the course of dealings with Atto Corporation. They invite us to examine the voluminous record, which they say offers legitimate explanations as to their course of conduct, expenditures of money etc.,[6] and would have us substitute our interpretation of those documents for that of the bankruptcy court. However, as Atto Corporation points out, the record consists mostly of financial records of the Aokis' various corporations, with little or no explanations of the transfers at issue. Without any explanation in the written documentation, the bankruptcy court was compelled to focus on the explanations offered by the witnesses at trial and, when weighing such testimony, determine the credibility of such witnesses. Assessing the testimony of the witnesses, the bankruptcy court concluded that the Aokis were not credible and rejected their testimony. We must give deference to the bankruptcy court's determinations in this regard.

■ The bankruptcy court rendered its decision after holding a two-day bench trial, during which it heard testimony from Mr. Yamada, Mr. Aoki, Mrs. Aoki and the Aokis' accountant. Over 100 exhibits were admitted into evidence. Clearly, the bankruptcy court was the "most steeped in the facts and sensitive to the interplay amongst the protagonists." *Betancourt v. Bennazar–Zequeira (In re Empresas Omajede, Inc.),* 227 B.R. 767, 769 (D.P.R. 1998) (citations omitted). Therefore, on appeal, we must give "due deference to the trial court's opportunity to observe, first-hand, witness demeanor and credibility, and credibility findings cannot be disregarded in the absence of facts which would compel contrary inferences. Simply put, the trial court is in a much better position to determine credibility." *Id.* (citations omitted). Accordingly, we affirm the

---

6. The Aokis claim that Byroma's funds were used for legitimate purposes, including payment of Byroma's expenses (such as rent and business taxes), professional fees (such as payments to Mr. Aoki's daughters for "marketing research"), intercorporate loans to their other corporations, repayment of loans from their other corporations, and pursuit of other business ventures.

bankruptcy court on the issue of piercing the corporate veil.

### C. Veil piercing as to Kay Aoki

The Aokis argue that the bankruptcy court erred in piercing the corporate veil as to Kay Aoki as she exercised little or no control of Byroma, and the actions of Henry Aoki should not be imputed to her. Although Mrs. Aoki testified that she merely performed clerical jobs for the companies, the bankruptcy court found that she actually performed a more significant role. For example, although Mrs. Aoki did not negotiate directly with Mr. Yamada, she was present for the meetings at the Aokis' home and Mr. Aoki consulted with her from time to time during the negotiations. In addition, Mrs. Aoki was involved with drafting and/or editing the Licensing Agreement. She signed various agreements on behalf of Byroma, including one of the addendums to the Licensing Agreement and the non-exclusive agency agreement with Wada Invention Center. Also, she served as a "study monitor" for various laboratory studies on the Extract. Finally, Mrs. Aoki handled the companies' accounts, signing checks and authorizing the transfers of money. Mrs. Aoki's involvement may have been less egregious than her husband's, but we find no clear error in the bankruptcy court's conclusion that she be held accountable.

### II. Section 523(a)(2)(A)

The bankruptcy court found that Byroma incurred its debt to Atto Corporation by fraudulently inducing Atto Corporation to pay over $1.2 million for services and products the Aokis had no intention of providing and, therefore, the debt should be excepted from discharge pursuant to § 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge a debt "for money, proper-

ty, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). In order to establish that a debt is nondischargeable under this section, a creditor must prove actual fraud, rather than mere fraud implied in law. *See* Lawrence P. King, 3 *Collier on Bankruptcy* ¶ 523.08[1] (15th ed. rev.2002). The elements of actual fraud include:

(1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;

(2) the debtor intended to deceive;

(3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation;

(5) the creditor's reliance was justifiable; and

(6) the reliance upon the false statement caused damage.

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir.2001) (citing *Palmacci*, 121 F.3d at 786). The first two elements of the *Palmacci* test describe the conduct and scienter required to show the debtor's fraudulent conduct generally. *Id.* The last four elements embody the requirement that the creditor's claim must arise as a direct result of the debtor's fraud. *Id.* The burden of proof on each element lies with the plaintiff. *Morin v. McIntyre (In re McIntyre)*, 64 B.R. 27, 29 (D.N.H.1986).

### A. False representation and intent to deceive

First, the plaintiff must show that the debtor made a knowingly false representation or one made in reckless disregard of the truth. In order to prove

that the Aokis made a false representation, Atto Corporation was required to show that at the time of making the relevant representation, the Aokis did not intend to perform the stated promise. *See Palmacci*, 121 F.3d at 787. To prove scienter, the plaintiff must show that the debtor acted with an actual intent to mislead or was reckless in disregarding the truth of a representation. *See id.* at 788–89. Because direct evidence of an intent to mislead or defraud is seldom available, these elements may be proven by the totality of circumstantial evidence. *See id.* at 789; *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir.1996). "Subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made...." *Williamson*, 87 F.3d at 603.

■ The Aokis clearly represented to Atto Corporation that they intended to fulfill Byroma's obligations under the Licensing Agreement. Under the Licensing Agreement, Byroma was required to build and deliver four Extraction Devices to Atto. In the interim, the Licensing Agreement required Byroma to complete and forward blueprints for the Japanese models. Looking at the conduct of Byroma and the Aokis' conduct after the Licensing Agreement, the bankruptcy court concluded that the Aokis never intended to fulfill their obligations under the Licensing Agreement based on their behavior after the Licensing Agreement and addendums were signed. Although Mr. Aoki testified that he did, in fact, place orders with Product Insight to build the Extraction Devices and that two units were completed by the end of August 2000, the bankruptcy court did not find this testimony to be credible. Rather, the bankruptcy court rejected the Aokis' version of events, concluding:

> The Aokis' late assertion of copyright violations against Atto and alleged and undocumented fear of reverse engineering, combined with a lack of evidence of any efforts by Byroma to perform under the Licensing Agreement and the immediate diversion of Atto's deposit to the Aokis, their various corporations and their family members, lead this Court to the conclusion that the Aokis' copyright violation and reverse engineering allegations were simply pretexts for nonperformance under the Licensing Agreement.

We must give deference to the bankruptcy court's factual findings on the question of intent. *See Palmacci*, 121 F.3d at 785 (deference to the factual findings of the bankruptcy court is appropriate on questions of intent "because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor."). Accordingly, since the Aokis failed to provide any evidence to support their claims that they had taken actions to fulfill their contractual obligations and the bankruptcy court did not find their testimony in this regard to be credible,[7] we find that the bankruptcy court did not err in concluding that the Aokis did not intend to perform.

**B. Justifiable reliance**

■ To invoke § 523(a)(2)(A), the creditor must show that he actually and justifiably relied on the false statement or statements. *Palmacci*, 121 F.3d at 786; *see also Field v. Mans*, 516 U.S. 59, 70–71, 116

7. Mr. Aoki testified that communications and/or orders with Product Insight were "primarily oral." Although he claims that there were written invoices, faxes and/or other records documenting the placement of the order, he failed to produce any such records, either at trial or during discovery.

S.Ct. 437, 133 L.Ed.2d 351 (1995). The burden on the creditor is relatively low. In order to show justifiable reliance, the creditor need not prove that he acted consistent with ordinary prudence and care. *See Sanford Inst. for Sav. v. Gallo,* 156 F.3d 71, 75 (1st Cir.1998). Thus, a party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation. *Id.*

■ The bankruptcy court concluded that Mr. Yamada's reliance was justifiable. Mr. Aoki gave Mr. Yamada numerous testimonial stories about the efficiency, popularity and interest in the Extraction Device and the Extract and made constant appeals to Mr. Yamada's belief in the "samurai spirit" and their shared Japanese heritage. The bankruptcy court did not err in concluding that Mr. Yamada's reliance was justifiable.

### C. Causation and damages

The Aokis argue that the bankruptcy court erred by failing to consider whether Atto Corporation had established each of the two elements of proximate cause, causation in fact and legal causation.

The First Circuit Court of Appeals has explained that § 523(a)(2)(A) requires a "direct link" between the alleged fraud and the creation of the debt to be excepted from discharge. *See Spigel,* 260 F.3d at 32 n. 7, 35; *see also Palmacci,* 121 F.3d at 787 (stating that the creditor must show that the debt "arose as a result" of the debtor's fraud). In *Spigel,* the First Circuit stated that the creditor must show that the debt owed to it "arises as a direct result of the debtor's misrepresentation or malice." *Spigel,* 260 F.3d at 32 (citing *Century 21 Balfour Real Estate v. Menna (In re Menna),* 16 F.3d 7, 10 (1st Cir. 1994)).

■ In analyzing the requirements of § 523(a)(2)(A), the Panel may look to the Restatement (Second) of Torts (1976) for guidance. *See Gem Ravioli v. Creta (In re Creta),* 271 B.R. 214, 218–19 (1st Cir. BAP 2002). The Restatement explains that proximate causation encompasses two elements, "causation in fact" and "legal causation." *See* Restatement (Second) of Torts, §§ 546, 548A (1976). "Causation in fact" requires that a debtor's misrepresentations be a "substantial factor in determining the course of conduct that results in [the] loss." *Id.* § 546. "Legal causation" requires that a creditor's loss "reasonably be expected to result from the reliance." *Id.* § 548A. Although the bankruptcy court did not separately address each of these types of causation in its order, both types of causation are present here.

Thus, the bankruptcy court did not err in concluding that all of the elements of § 523(a)(2)(A) had been met, and that the debt owed to Atto Corporation should be excepted from discharge pursuant to § 523(a)(2)(A).

### III. Section 727(a)(5)

■ The bankruptcy court denied each Aoki a discharge under § 727(a)(5) due to their failure to provide a satisfactory explanation for the disappearance of Atto's $1.2 million investment in Byroma. We will not overturn a bankruptcy court's decision to deny discharge under § 727(a)(5) unless it is clearly erroneous. *See D'Agnese,* 86 F.3d at 734. "This standard applies both to subsidiary fact questions, such as whose version of events is correct, as well as to the ultimate question of whether the debtor has satisfactorily explained the loss of assets." *Id.*

■ Section 727(a)(5) provides that "the court shall grant the debtor a discharge, unless ... the debtor has failed to explain satisfactorily ... any loss of assets

or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Section 727(a)(5) is broadly drawn and gives the bankruptcy court broad power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets. *See D'Agnese,* 86 F.3d at 734 (citing *First Fed. Life Ins. Co. v. Martin (In re Martin),* 698 F.2d 883, 886 (7th Cir.1983)).

Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced a loss of assets or deficiency of assets; and (2) that the debtors cannot provide a satisfactory explanation for such loss. *See* Lawrence P. King, 6 *Collier on Bankruptcy* ¶ 727.08 (15th ed. rev.2002).

There are two stages of proof with respect to this section. The plaintiff has the initial burden of producing some evidence that the debtor no longer has assets which he previously owned. *See Ehle v. Brien (In re Brien),* 208 B.R. 255, 258 (1st Cir. BAP 1997). Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory explanation for the loss or deficiency of the asset. *Krohn v. Cromer (In re Cromer),* 214 B.R. 86, 95 (Bankr.E.D.N.Y.1997).

### A. Loss of assets previously owned.

The Aokis argue that Atto Corporation failed to meet its initial burden of proof since there is no evidence that the Aokis personally owned the assets at issue. According to the Aokis, since the funds were paid to Byroma and there is no evidence that any of those specific funds became assets of the Aokis, they cannot be denied a discharge under § 727(a)(5) for the loss of such assets. We disagree. Once the bankruptcy court pierced the corporate veil and disregarded Byroma's corporate structure, the assets of Byroma became attributable to the Aokis' bankruptcy estate. Consequently, any loss or reduction

of those assets could form the basis for denying a discharge under § 727(a)(5). Atto Corporation met its initial burden of proof by showing that it paid $1,073,000 to Byroma in May 2000, and that by the end of June 2000, more than $800,000 of that money had been transferred out of Byroma's accounts. The burden then shifted to the Aokis to satisfactorily explain the disappearance of this money.

### B. Explanation of loss.

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *See Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir.1966). In determining whether to grant a discharge under § 727(a)(5), a court is interested in what happened to a debtor's assets and not in the wisdom of the debtor's disposition of the assets. *See id.* Moreover, unlike § 727(a)(2)(A), there is no requirement under § 727(a)(5) that a debtor act fraudulently or intentionally. *See Cromer,* 214 B.R. at 95.

A debtor's explanation need not be comprehensive, but it must meet two criteria: First, it must be supported by at least some corroboration. *See, e.g., Wortman v. Ridley (In re Ridley),* 115 B.R. 731, 737 (Bankr.D.Mass.1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616 (11th Cir.1984); *First Tex. Sav. Ass'n v. Reed (In re Reed),* 700 F.2d 986 (5th Cir. 1983)). Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. *Id.* A debtor's explanation must consist of more than "a vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions." *Id.* (citations omitted). "A jumble of vague, unassorted memoranda, checks, bank statements, and

bills" is insufficient. *Id.* at 738 (citing *Jackson v. Menick*, 271 F.2d 806, 809 (9th Cir.1959)). Therefore, discharge will be denied when a debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation. *Id.* at 737–38 (citations omitted).

■ The Aokis produced corporate ledgers to show the legitimacy of various deposits, transfers and withdrawals of money from Byroma. However, these ledgers contain little or no explanation, and their testimony lacked other documentary corroboration. For example, the Aokis assert that certain transfers made from Byroma to Mrs. Aoki and to their other corporations were "loans" or "repayment of loans," but no loan documentation was offered to support their position. Similarly, the Aokis claim that transfers of approximately $145,000 to Mr. Aoki's daughters between April 25, 2000 and March 30, 2001 were payment for patent and market research, and for rent for a Japanese office. However, the record contains no corroboratory invoices, reports or other evidence of research.[8] Nor is there any corroborating evidence of an office in Japan.[9] Accordingly, the bankruptcy court did not err in concluding that the Aokis had not offered a satisfactory explanation for the loss of Byroma's assets and denying the Aokis a discharge under § 727(a)(5).

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's decision

to pierce the corporate veil as to both Henry Aoki and Kay Aoki. We also AFFIRM the bankruptcy court's determination that the debt owed to Atto Corporation is nondischargeable pursuant to § 523(a)(2)(A), and the denial of the Aokis' discharge pursuant to § 727(a)(5).

---

8. In fact, Mr. Aoki testified that there were no written agreements, that his requests to his daughters to perform "patent searches" and "market research" were verbal. He also admitted that he did not receive any expense reports or other proof that they were using that money for market research.

9. When questioned about the alleged office space in Japan, Mr. Aoki could not recall when the office(s) were opened or where they were located.